STATE ex rel Kip O'CONNOR,
*Relator-Appellant,*

*v.*

Kenneth HELM,
Compliance Hearings Officer,
Clackamas County,
*Defendant-Respondent.*

STATE ex rel Kip O'CONNOR,
*Relator-Appellant,*

*v.*

CLACKAMAS COUNTY,
*Defendant-Respondent.*

Clackamas County Circuit Court
CV11040349, CV10070670;
A149697 (Control), A152148

359 P3d 550

Gary G. Linkous argued the cause and filed the briefs for appellant.

Scott C. Ciecko argued the cause for respondents. With him on the brief was Stephen L. Madkour, County Counsel, Clackamas County.

Before Duncan, Presiding Judge, and Lagesen, Judge, and Wollheim, Senior Judge.

DUNCAN, P. J.

## DUNCAN, P. J.

In this consolidated appeal, the relator, Kip O'Connor, appeals judgments in two mandamus cases that arose out of a dispute between O'Connor and Clackamas County about development permits relating to a rock revetment (commonly referred to as a retaining wall or rip-rap) along the Sandy River. In the first mandamus action ("the permit case") (A152148), O'Connor sought to compel the county to issue a floodplain development permit—for the revetment but also for authorization to construct a new residence on a lot along the river—on the ground that the county failed to take final action on that permit application within 150 days after the application was complete. *See generally* ORS 215.429 (authorizing a mandamus remedy when the county fails to take timely action on a permit application). The county moved for summary judgment on the petition, which the circuit court granted on multiple grounds, including that approval of the requested permit would violate substantive provisions of the county code. The circuit court then awarded attorney fees to the county as the prevailing party. For the reasons discussed below, we affirm the circuit court's grant of summary judgment in the permit case but vacate and remand the award of attorney fees for reconsideration.

In the second mandamus action ("the enforcement case") (A149697), O'Connor sought a peremptory writ to compel a county hearings officer to issue a final order in a code-violation proceeding that the county had initiated because O'Connor had not obtained a floodplain development permit after completing the revetment. The circuit court entered a judgment quashing that petition on the ground that O'Connor should have requested an alternative writ rather than a peremptory writ. On appeal, O'Connor argues that the circuit court erred in concluding that a peremptory writ was unavailable under the circumstances and that, in any event, he should have been allowed to replead his claims as a declaratory judgment action. As we will explain, we conclude that the enforcement case is moot, because the county has since dismissed the underlying proceedings that are the predicate for the specific act—issuance of a final order—that O'Connor sought to compel through mandamus

relief, and that O'Connor was not entitled to restyle his petition as a claim for declaratory relief.

## I. BACKGROUND

Although this appeal involves a complicated and contentious history between the parties, many of those facts are not pertinent to our resolution; accordingly, we recite only those facts that bear on the dispositive assignments of error. O'Connor operates a construction and excavation business, Big Mountain Excavation, and is also a member of Lifestyle Ventures, LLC (Lifestyle Ventures), a limited liability company that owns real estate along the Sandy River. O'Connor's fiancée, Lisa Konell, owns a lot adjacent to lots owned by Lifestyle Ventures.

In January 2009, the Sandy River reached flood stage, which caused erosion to property along the river, including lots owned by Lifestyle Ventures and Konell. O'Connor, who is experienced in working in the riparian areas along the Sandy River, applied to the Oregon Department of State Lands for an emergency authorization to repair and protect the riverbank from further erosion. The department issued the authorization on February 2, 2009, and a copy of it was forwarded to the Clackamas County Planning Department. O'Connor completed the authorized work, which involved installation of a large rock revetment. The authorization stated, "In addition, you should contact your city or county planning office to be sure your project is in compliance with local land use plans and programs."

### A. *The Permit Case*

On August 11, 2009, O'Connor applied for a County Floodplain Development Permit for the revetment pursuant to the county's zoning and development ordinance. However, O'Connor also wanted to build a residence on his fiancée's lot (tax lot 4400), so his permit application included a request to construct a new residence as well.

On August 17, 2009, Steve Hanschka, who was in the county's planning division, provided O'Connor with a Notice of Incomplete Application with regard to the floodplain development permit. The notice indicated, through handwritten markings on a standardized form, which materials

were missing and informed O'Connor that the application would be considered "void" unless, within 180 days of the date the application was first submitted, he provided (1) all of the missing information; (2) some of the missing information and written notice that no other information would be provided; or (3) written notice that none of the missing information would be provided.

On December 2, 2009, O'Connor delivered a packet of additional materials to the county in response to the notice. On the same day, the county provided him with a second "Notice of Incomplete Application." The second notice stated:

"1. The recently submitted materials do not address, or provide appropriate documentation for, Subsection 703.10(J)(1)(e) [requiring evidence from a professional engineer that the proposal complies with certain sections of the code and that 'the proposed stream bank protection measures will cause no adverse impacts to upstream or downstream properties, when compared to impacts of the pre-existing conditions].'

"2. The materials do not provide a plan of the entire site development that is proposed, or already has been developed * * *, *all of which are likely to have been, or to be, installed within the Regulatory Floodway, none of which is allowed within the Regulatory Floodway* * * *.

"3. The County has determined Base Flood Elevation (BFE) at the westerly edge of Tax Lot 4400 to be [higher than listed on the] Elevation Certificate and Site Plan. *Thus, from the County's perspective, the entire site is located within the Regulatory Floodway. To resolve this dispute, the applicant may file a Letter of Map Amendment (LOMA) through [the Federal Emergency Management Agency (FEMA)] that requests to remove, from the floodplain/ Regulatory Floodway, all areas of the site that are above the applicant's determination of BFE across the site, and the County will agree with FEMA's determination of BFE across the site.*

"* * * * *

"5. Again, *if through a LOMA, FEMA determines that there are areas of the site that are above BFE, and thus not*

*in the Regulatory Floodway, then development in those areas could proceed normally."*

(Emphases added.) Like the first notice, the second notice gave O'Connor three options: provide all the missing information, provide some of the missing information and notice that nothing more would be submitted, or provide notice that no additional information would be supplied. O'Connor returned the notice after checking a box that stated, "I am submitting the required information (attached)." Next to that box, O'Connor made a notation to the effect that a LOMA would be forthcoming.

At the same time that it provided the second notice that O'Connor's application was incomplete, the county presented O'Connor with a document entitled "150 Day Waiver Request," which O'Connor reluctantly agreed to sign. (According to O'Connor, he only agreed to sign the waiver because the county "threatened" him that it otherwise would not continue to process his permit application, thereby exposing him to criminal fines and penalties in the enforcement proceeding.) The waiver stated that O'Connor was "requesting additional time to provide information or argument regarding the above land use application" and that he understood that "this request may make it impossible for the County to render a final decision within 150 days of the date a complete application was filed, and therefore agree to waive any right of action under ORS 215.427."

Later that month, on December 22, 2009, O'Connor submitted a LOMA application to FEMA to change the floodway designation for land identified in the permit application. On February 9, 2010—more than 180 days after O'Connor's floodplain development permit application was filed—the LOMA application was returned to him because the county, which was required to sign off on the LOMA application, had refused to do so.

Meanwhile, as we will later discuss in greater detail, the county was moving forward with enforcement proceedings for code violations based on the revetment that O'Connor built, and at a hearing in those proceedings on February 23, 2010, O'Connor had an opportunity to cross-examine Hanschka. During the hearing, Hanschka

acknowledged that the engineering report, which was identified as missing in the county's second notice of incomplete application, had actually been provided by O'Connor on December 2, 2009, but had been misfiled with a different application. Hanschka testified that he would therefore process the floodplain development permit application as "deemed complete" as of December 2, 2009.

O'Connor followed up with an email to Hanschka after the hearing, asking for clarification on whether his floodplain development permit application had been "deemed complete" for purposes of the permitting process. The county subsequently issued a notice that it had accepted O'Connor's application as complete. The notice stated that the application "was determined to be complete on March 11, 2010"—the day after O'Connor's email.

Shortly thereafter, on March 19, 2010, the county planning division issued a preliminary denial of O'Connor's requested development permit. O'Connor timely appealed that decision, and the county scheduled a hearing for July 29, 2010. On July 21, 2010, O'Connor asked to postpone that hearing for 90 days, but the request was not granted. Rather than proceed with the scheduled hearing, O'Connor elected to file, on the morning of July 29, a petition for a writ of mandamus in the circuit court pursuant to ORS 215.429, thereby depriving the county of jurisdiction to act. *See* ORS 215.429(1) (authorizing an applicant to file a petition for a writ of mandamus when the county has not taken final action on a permit application within the time specified); ORS 215.429(2) (providing that, after a mandamus petition is filed, "jurisdiction for all decisions regarding the application, including settlement, shall be with the circuit court").

In his mandamus petition, O'Connor alleged that his application was complete as of December 2, 2009, and that more than 150 days had passed without a final decision by the county. Thus, he alleged that he was "entitled to a peremptory writ requiring the county to issue an approval of his application unless the County or an intervenor shows that approval would violate a substantive provision of the comprehensive plan or land use regulations." *See* ORS 215.429(5) (providing that the court "shall issue

a peremptory writ unless the governing body or any intervenor shows that the approval would violate a substantive provision of the county comprehensive plan or land use regulations").

In response to the petition, the county moved for summary judgment, which the circuit court granted on various independent grounds. Some of those grounds concerned the timing of the county's obligation to make a final decision. The circuit court ruled that O'Connor's representation that he would submit a LOMA, in response to the second notice that his application was incomplete, prevented the application from being "deemed complete" until he provided that information or told the county that it would not be forthcoming. The court concluded that, because he did neither within 180 days of filing the application, his application was void and the county was not required to act on it. *See* ORS 215.427(4) (setting forth when an application becomes "void").

Alternatively, but relatedly, the court ruled that, even if the application was "deemed complete," O'Connor's representation about providing additional information would have "excused performance" by the county; that O'Connor had extended the county's time for a decision by signing the waiver of the 150-day period; and that O'Connor had a "plain, speedy, and adequate remedy"—*i.e.*, continuing with the administrative process—that made mandamus relief inappropriate under the circumstances.

In addition to those reasons, the court offered yet another justification for why mandamus relief was not available as a matter of law: that approval of the permit requested by O'Connor would violate substantive provisions of the county code. The court explained:

> "The County asserts that the undisputed fact is that the property in question currently lies entirely within the regulatory floodway as established by FEMA. Upon review of the record before the Court and considering the arguments of the parties, this Court is inclined to agree.
>
> "[O'Connor] attempts to defend against dismissal by asserting that the property is not in fact within the floodplain. [O'Connor] provides a wealth of factual evidence that

the property should not be classified as within the regulatory floodway. However, [O'Connor] provides no evidence and makes no argument that FEMA's classification has in fact changed. [O'Connor] conceded at oral argument that a LOMA permit signed by the County was the proper method to determine this issue.

"As such, this Court finds that a grant of mandamus in the case at bar would violate substantive law."

The court subsequently awarded the county its attorney fees as the prevailing party in the action, based in part on its ruling that O'Connor had pursued a mandamus remedy while he still had the "plain, speedy, and adequate remedy" of continuing through the administrative process, including review by the Land Use Board of Appeals (LUBA).

B. *Enforcement Proceedings*

During the time that O'Connor was pursuing a floodplain development permit, the county was nonetheless proceeding with the enforcement process for code violations based on the fact that O'Connor had not obtained permits for the revetment work. On October 27, 2009, the county had issued citations to Lifestyle Ventures for "fail[ing] to submit complete land use applications to abate river violation." On February 3, 2010, the county filed formal complaints against various landowners, Lifestyle Ventures included, for not having permits for the revetment built by O'Connor.

On March 17, 2010, a hearings officer for the enforcement proceeding issued a "continuing order" in which he concluded that the county had proved that Lifestyle Ventures and other property owners had violated the county code "by removal of vegetation and construction of a riprap wall on properties they own along the bank of the Sandy River, without land use approval, and this is a continuing violation." The continuing order explicitly stated, "[T]his order is NOT a final order." (Uppercase in original.)

O'Connor subsequently initiated a second mandamus action, taking issue with the hearings officer's issuance of a "continuing order" rather than a final order that O'Connor could challenge by way of writ of review. O'Connor's mandamus petition sought "a peremptory writ directing

Clackamas County Hearing Officer, Carl Cox, to promptly issue a final order."

The circuit court ruled against O'Connor in the enforcement case as well, concluding that O'Connor improperly sought a peremptory rather than an alternative writ of mandamus. *See* ORS 34.160 ("When the right to require the performance of the act is clear, and it is apparent that no valid excuse can be given for not performing it, a peremptory mandamus shall be allowed in the first instance; in all other cases, the alternative writ shall be first issued."). O'Connor then moved for a new trial, arguing, among other contentions, that he should be permitted to restyle his petition as a request for a declaratory judgment. In response, the county[1] pointed out that it had dismissed the underlying enforcement actions after the circuit court's ruling, so the issue was moot. The circuit court denied the motion for a new trial and entered a judgment dismissing the action.

## II.  ANALYSIS

### A.  *The Enforcement Case*

We begin with O'Connor's first two assignments of error, which relate to the enforcement case. He contends that the circuit court erred in (1) quashing the peremptory writ and (2) dismissing the case without giving him the opportunity to replead. The county responds that the appeal is moot as a result of the county's dismissal of the enforcement proceedings regarding the underlying code violations. We agree with the county.

A case is considered moot if a decision by the court "no longer will have a practical effect on or concerning the rights of the parties." *Brumnett v. PSRB*, 315 Or 402, 406, 848 P2d 1194 (1993). For instance, "a case becomes moot when an event occurs that 'render[s] it impossible for the court to grant effectual relief.'" *Hamel v. Johnson*, 330 Or 180, 184, 998 P2d 661 (2000) (quoting *Greyhound Park v. Ore. Racing Com.*, 215 Or 76, 79, 332 P2d 634 (1958)). That

---

[1] The defendant in the enforcement case is the county hearings officer, but is represented by county counsel. For readability, we generally refer to "the county" as the defendant throughout this opinion.

is precisely what happened in this case. O'Connor sought a writ "directing Clackamas County Hearing Officer, Carl Cox, to promptly issue a final order" in the county's enforcement proceedings, but those proceedings have since been dismissed; thus, it is no longer possible for the court to grant O'Connor's requested mandamus relief.

On appeal, O'Connor does not contest that fact. That is, he does not argue that there remains any present dispute as to whether the court should order the county to issue a final order, as requested in his petition. Rather, O'Connor contends that there remains a justiciable controversy with regard to the underlying dispute that gave rise to the enforcement proceeding, and that the circuit court should have allowed him to restyle his pleading in a way that presented *that dispute* for review after the court rejected his request for a peremptory writ. Specifically, O'Connor contends that he should have been allowed to amend his mandamus petition to state a claim for declaratory relief with regard to whether his emergency work is in violation of the county code. In other words, O'Connor essentially concedes that "[t]he voluntary temporary cessation of the code violation hearing may eliminate a mandamus proceeding, but it does not eliminate the right to challenge the County's action and their stated position by declaratory relief when they attempt to render the initial action moot."

In support of that argument, O'Connor relies, as he did in the circuit court, on ORS 34.740. That statute provides:

"(1) A circuit court *shall* allow a person to amend a petition or action in the manner provided by this section if:

"(a) The person seeks relief against a public body, as defined in ORS 192.410;

"(b) The person incorrectly filed a petition for a writ of review, a petition for a writ of mandamus or an action for declaratory judgment; and

"(c) The correct remedy of the person is a petition for a writ of review, a petition for a writ of mandamus or an action for declaratory judgment."

(Emphasis added.) O'Connor argues that the county hearings officer is a "public body" under ORS 192.410(3),[2] and that, "since the court found the peremptory writ inappropriate[,] the relator has the right to amend his writ" to seek the correct remedy—an action for a declaratory judgment.

We are not persuaded that ORS 34.740 was intended to address O'Connor's situation. The statute was enacted, along with ORS 14.165, as part of House Bill (HB) 3119, which was intended to address circumstances in which a citizen mistakenly files the wrong type of action against a public body or files it in the wrong place. Or Laws 2001, ch 561, §§ 1, 2; Audio Recording, House Floor Hearing, HB 3119, Apr 27, 2001, at 1:22 (statement of Rep Kathy Lowe, explaining that the process for suing a public body is confusing, that a citizen may be required to seek declaratory relief, a writ of mandamus, a writ of review, or other relief, and that the bill was intended to assure that mere technicalities do not prevent citizens from addressing legitimate issues with a public body), http://www.leg.state.or.us (accessed Sept 17, 2015); Audio Recording, Senate Floor Hearing, HB 3119, May 31, 2001, at 48:00 (statement of Sen Peter Courtney, likewise explaining that the bill ensures that citizens will not be penalized for mistakenly filing an action against a public body in the wrong forum), http://www.leg.state.or.us (accessed Sept 17, 2015).

Consistent with that intent, one of the explicit predicates for an amended petition under ORS 34.740 is that the citizen "*incorrectly* filed a petition for a writ of review, a petition for a writ of mandamus or an action for declaratory judgment" when the citizen should have filed a different form of action. (Emphasis added.) Here, petitioner did not "incorrectly" file a petition for a writ of mandamus instead of a petition for declaratory relief, and the circuit court did not reject his petition on that basis. On the contrary, the circuit court ruled that O'Connor had not demonstrated a

---

[2] ORS 192.410(3), which defines terms for public records statutes, provides that "'[p]ublic body' includes every state officer, agency, department, division, bureau, board and commission; every county and city governing body, school district, special district, municipal corporation, and any board, department, commission, council, or agency thereof; and any other public agency of this state."

clear entitlement to the extraordinary remedy of a peremptory writ, as opposed to an alternative writ of mandamus.

In short, the pleading amendment that O'Connor proposed—to convert his petition from a mandamus action in which the legal question was whether he was entitled to a final order, into a declaratory judgment action in which the legal question was whether his emergency work is in violation of the county development code—is one of substance, not form or forum. O'Connor does not point to anything in the text, context, or legislative history of ORS 34.740 that would suggest that the statute was intended to confer a right to make that type of substantive amendment during the course of a judicial proceeding, and the circuit court correctly rejected his reading of that statute. Therefore, even assuming that O'Connor could plead a justiciable declaratory judgment claim regarding his underlying dispute with the county, ORS 34.740 did not require the court to allow him to do so as part of a mandamus action directed at a hearings officer's conduct in a particular enforcement proceeding.[3] Accordingly, we reject O'Connor's argument that he should have been allowed to plead a declaratory judgment action, and we conclude that his appeal of the judgment of dismissal in Case No. A149697 is therefore moot.[4]

B. *The Permit Case*

1. *Summary Judgment Ruling*

O'Connor's remaining assignments of error concern the circuit court's rulings in his land-use mandamus action, in which he sought issuance of a floodplain development permit. The circuit court dismissed that petition on multiple independent grounds, including that approval of O'Connor's requested permit would violate the county's substantive

---

[3] Although O'Connor cites ORCP 23 in his reply brief on appeal, he does not develop any argument as to why the trial court was required to allow him to amend his petition under that rule, and we do not address that issue.

[4] In *Couey v. Atkins*, 357 Or 460, 520, 355 P3d 866 (2015), the Supreme Court recently held that "Article VII (Amended), section 1, does not *require* dismissal [of moot cases] in public actions or cases involving matters of public interest." (Emphasis in original.) That holding does not bear on our decision in this case, because there is no developed argument (or indication in the record) that the enforcement case presents issues that are likely to recur but evade review. *See id.* ("We also do not hold that moot cases will no longer be subject to dismissal.").

restrictions on development in the regulatory floodway of the Sandy River. We view the facts in the light most favorable to O'Connor, the nonmoving party, *Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997), and we affirm the court's ruling.

In the application underlying this mandamus action, O'Connor sought a permit for emergency work that he had already performed, as well as for construction of a new single-family residence on tax lot 4400. In response, the county asserted that approval of the permit would violate a substantive provision of the county code—namely, County Development Code (CDC) section 703.07, which provides that "[d]evelopment in the floodway is prohibited," subject to certain limited exceptions, which include certain emergency and repair work but not the construction of a new residence.[5]

CDC section 703.07 is among the county's regulations concerning the Floodplain Management District (FMD). The FMD applies to the special flood hazard area that has been "identified by the Federal Insurance Administration in a scientific and engineering report entitled, 'The Flood Insurance

---

[5] CDC section 703.07 provides:

"Development in the floodway is prohibited, except as provided in Subsection 703.06(B) [concerning repair, rehabilitation, reconstruction, or improvement of structures preexisting the Flood Insurance Rate Map], or for the uses listed in this subsection. The following uses are allowed only if permitted in the underlying zoning district and, with the exception of fish enhancement projects, require approval of a Floodplain Development Permit:

"A. Development that requires a waterfront location (e.g., marinas and boat ramps). A 'no-rise' certification shall be provided.

"B. Riprap or other structural stream bank protection measures. A 'no-rise' certification and the evidence required in Subsection 703.10(J)(2) shall be provided, or the criteria in Subsection 703.10(J)(1) shall be met.

"C. Hydroelectric facilities. A 'no-rise' certification shall be provided;

"D. Stream crossings, except those that are a direct component of a fish enhancement project sponsored or approved by a state or federal agency, subject to Subsection 703.10(G);

"E. Replacement, substantial improvement, or repair of substantial damage of a structure that was constructed prior to the establishment of, or revisions to, the floodway * * *.

"F. Fish enhancement projects—including stream crossings that are a direct component of such projects—sponsored or approved by a state or federal agency * * *."

Study for Clackamas County, Oregon & Incorporated Areas,' (FIS) dated June 17, 2008, with accompanying Flood Insurance Rate Maps (FIRMs)." CDC § 703.04.

The special flood hazard area includes, among other things, the "floodway," which is the "channel of the river or other watercourse and the adjacent land areas that must be reserved in order to discharge the base flood without cumulatively increasing the water surface elevation more than one foot, often referred to as the 'regulatory floodway.'" CDC § 703.05(U).[6] The "regulatory flood," also known as the "100-year flood" or "base flood," is the "national standard used by the National Insurance Flood Program and all federal agencies for the purposes of requiring the purchase of flood insurance and regulating new development." CDC § 703.05(A). The "[b]ase flood elevation" is defined in the code as the "computed elevation to which floodwater is anticipated to rise during the base flood. Base flood elevations are shown on Flood Insurance Rate Maps and on the flood profiles included in the Flood Insurance Study." CDC § 703.05(B).

The county code expressly recognizes that the regulatory floodway on the existing federal maps (FIRMs) can be overly inclusive, sometimes incorrectly identifying a property's location in relation to the special flood hazard area. The county code includes reference to a Letter of Map Amendment (LOMA), which the code defines as

> "[a]n official amendment, by letter from the Federal Emergency Management Agency, to an effective National Flood Insurance Program map. A LOMA establishes a property's location in relation to the special flood hazard area. *LOMAs usually are issued because a property has been inadvertently mapped as being in the floodplain, but is actually on natural high ground above the base flood elevation."*

---

[6] The "Special Flood Hazard Area" (SFHA) is defined as the "land area covered by the floodwaters of the base flood on National Flood Insurance Program (NFIP) maps and, thus, the area determined by detailed or approximate studies to be in a 100-year floodplain. The SFHA is subject to the NFIP's floodplain management regulations and the mandatory purchase of flood insurance. The SFHA includes the floodway, flood fringe, flood hazard, flood prone, and shallow flooding areas." CDC § 703.05(LL).

CDC § 703.05(W) (emphasis added). Thus, the code contemplates a process for addressing circumstances in which property is inadvertently included in the regulatory floodway, in light of federal regulation of floodplain management. *See* 44 CFR § 60.3 ("[W]hen special flood hazard area designations and water surface elevations have been furnished by the Federal Insurance Administrator, they shall apply."); 44 CFR § 60.3(d) (setting forth requirements for communities to follow "[w]hen the Federal Insurance Administrator has provided a notice of final base flood elevations within Zones A1–30 and/ or AE on the community's FIRM and, if appropriate, has designated AO zones, AH zones, A99 zones, and A zones on the community's FIRM, and has provided data from which the community shall designate its regulatory floodway").

Part of the permit dispute between O'Connor and the county, which we briefly described earlier, 273 Or App at 722, concerned whether the subject property—including tax lot 4400—was in the regulatory floodway. O'Connor took the position that the subject property should not have been classified within the regulatory floodway, while the county concluded that, based on the FIRM and flood profiles from the adopted FIS, the property was located within the floodway. The county then insisted on a LOMA to resolve the dispute but—much to O'Connor's frustration—refused to sign off on the LOMA, which caused FEMA to cancel the LOMA process after O'Connor had spent thousands of dollars preparing the application.

For purposes of summary judgment, it was undisputed that tax lot 4400 is shown on the FIRM and flood profiles to be within the regulatory floodway. However, the parties disputed the legal significance of that fact. O'Connor argued that his experts could prove that the property was inadvertently mapped in the floodplain, and that the county's refusal to sign off on the LOMA was the only barrier to obtaining a LOMA and building the residence on the property. O'Connor also offered an ORCP 47 E declaration on that issue, and, at the summary judgment hearing, his counsel explained:

"So I've also—in my declaration, Your Honor, I have put in there what—what we're required to do with experts. And

that is, we have experts that are readily available to testify this property is not in the floodplain. And if they could have gotten the County to cooperate, they're going to testify they would have gotten their LOMA, and the house would have been okay."

The trial court rejected O'Connor's arguments and ruled that his evidence regarding the floodplain, including his declaration about experts, was beside the point. The court explained that O'Connor had provided "a wealth of factual evidence that the property should not be classified as within the regulatory floodway," but that he "provides no evidence and makes no argument that FEMA's classification has in fact changed" and "conceded at oral argument that a LOMA permit signed by the County was the proper method to determine this issue." Thus, the circuit court concluded that, on the record before it, approving the permit to build a home on property classified within the floodplain would violate the substantive prohibition on such development set forth in CDC section 703.07.

On appeal, O'Connor's argument, as we understand it, is that the circuit court's reasoning in that regard was incorrect for two reasons: (1) There were disputed issues of fact regarding whether the property is actually on high ground above the base flood elevation, and a LOMA therefore could be made a condition of approval; and (2) in any event, the writ should not have been dismissed in its entirety because the permit sought approval for at least some activities (the revetment and repair of a county roadway) that are allowed within the regulatory floodway. We are not persuaded by those arguments.

As the circuit court understood the case, the question framed by the parties below was not whether there was a factual dispute about whether the subject property *should be* designated as part of the regulatory floodway; the question was whether it *has been,* in light of the fact that the relevant parts of the county's code, when viewed in the context of federal regulations, make clear that the regulatory floodway is determined in the first instance by the flood profiles included in the FIS and the accompanying FIRMs. O'Connor does not dispute that the subject property,

including tax lot 4400, is within the regulatory floodway as shown on FEMA's existing maps. Nor does he dispute that, as of the date of the mandamus action, no LOMA had been processed by FEMA to change that designation; in fact, one of O'Connor's complaints is that the county planning director incorrectly refused to sign off on the LOMA, thereby precluding him from obtaining the LOMA to which he would otherwise be entitled. On this record, and in light of the parties' arguments, the trial court correctly ruled that there is no genuine issue of material fact as to whether tax lot 4400 is within the designated regulatory floodway, thereby precluding the construction of a new residence on that lot under the restriction in CDC section 703.07 in the absence of a change of designation.[7]

The question, then, is whether the lack of a LOMA in this case was a proper basis for summary judgment. O'Connor points out that, under ORS 215.429(5), the writ "may specify conditions of approval that would otherwise be allowed by the county comprehensive plan or land use regulations," and he argues that his permit could be approved as submitted, with the LOMA merely made a condition of that approval. However, O'Connor does not explain how a LOMA—which requires agency action by the county *and by FEMA*, is the type of "condition" that is authorized by

---

[7] We note that there are other parts of the county code, such as CDC section 703.08(B) and section 703.11(A), which suggest that the county's planning director can, in some circumstances, make determinations about what is in the flood fringe or floodway based on a "federal, state or other authoritative source." *See, e.g.,* CDC § 703.08(B) ("Within the special flood hazard area, when more detailed base flood elevation or floodway data is available outside of the adopted Flood Insurance Study (FIS) from a federal, state or other authoritative source—such as preliminary or draft information from a new study that will revise the FIS—the Planning Director may obtain, review, and reasonably utilize such data. When the data pertains to a preliminary or draft FIS in Zone A, the Planning Director is required to reasonably utilize the data, and is allowed discretion in using this data only to the extent that the technical or scientific validity of the data in the draft or preliminary FIS is questioned by a qualified professional."). However, O'Connor does not cite those provisions, let alone develop any argument as to their significance in this case. The circuit court understood O'Connor to "concede" during the summary judgment hearing that a LOMA was the proper method to resolve whether the property is within the regulatory floodway, and he does not address that aspect of the court's ruling on appeal. Accordingly, we assume, as did the circuit court, that a LOMA is the proper way to resolve whether tax lot 4400 is within the regulatory floodway for purposes of satisfying the criteria of the county code.

the county comprehensive plan or land use regulations.[8] If O'Connor is entitled to a LOMA, as he claims, the remedy is a separate mandamus action to compel the planning director to sign off on the application to FEMA, not an approval of a permit conditioned on O'Connor actually satisfying the criteria of the code at some later date.[9]

O'Connor's final contention in opposition to summary judgment is that, even if permission to build a home on tax lot 4400 would violate a substantive provision of the county code, there remain genuine issues of material fact as to whether other parts of the permit—approval of the revetment work and road repair—would violate the code, and the court therefore erred in dismissing the writ in its entirety. However, O'Connor develops no argument, and cites no authority, for that proposition—*i.e.*, that the circuit court in a mandamus action can pare down a requested permit to avoid violating a substantive provision of the county code, and then compel the county to issue that pared-down permit. As the applicant, O'Connor was in a position to define the breadth of the application; he sought a single permit from the county and then enlisted the court, through mandamus, to compel the issuance of that permit. We will not, on our own, supply an argument for why the court erred in holding O'Connor to the permit he requested. *See Beall Transport Equipment Co. v. Southern Pacific*, 186 Or App 696, 700 n 2, 64 P3d 1193, *adh'd to on recons*, 187 Or App 472, 68 P3d 259 (2003) ("[I]t is not this court's function to speculate as to what a party's argument might be. Nor is it

---

[8] CDC section 703.09(D) provides that "[t]he County may attach conditions of approval to [a floodplain development permit] if such conditions are deemed necessary to further the purpose of this section." It then provides a nonexclusive list of the type of conditions that might be applied, though nothing in the list suggests that a LOMA is a permissible condition of approval. *Id.* ("Such conditions may include, but are not limited to: 1. Limitations on periods of use and operation; 2. Imposition of operation controls, sureties, and deed restrictions; and 3. Floodproofing and other protective measures * * *.").

[9] Although he does not explicitly argue the matter on appeal, we note that O'Connor offered an ORCP 47 E declaration in which his attorney averred that he had retained an expert to testify on "[t]he issue of whether or not a home can be built on the subject property under conditions that do not violate substantive land use regulations and laws." However, the question before us—whether a LOMA is the type of "condition" of approval that is permitted in these circumstances—is one of law that is not susceptible to proof by expert testimony.

our proper function to make or develop a party's argument when that party has not endeavored to do so itself.").

In sum, in light of the evidence offered by the parties and the arguments framed below and on appeal, we affirm the circuit court's grant of summary judgment in the permit case.

2. *Attorney Fees*

Last, we turn to O'Connor's challenges to the circuit court's award of attorney fees to the county as the prevailing party in the permit case. O'Connor contends that the court erroneously based the award on the fact that he elected the mandamus process rather than continuing with the administrative process, and that the amount of the award was excessive in light of the internal rate that county counsel charges when it represents a department of the county. We agree with O'Connor that the circuit court relied on an improper factor when awarding fees to the county, and we therefore vacate and remand the award for reconsideration without reaching the question of the amount of the award.

An award of attorney fees to the prevailing party in a mandamus proceeding under ORS 215.429 involves an exercise of discretion on the part of the circuit court based on the factors set forth in ORS 20.075(1). *See State ex rel Stewart v. City of Salem*, 268 Or App 491, 497, 343 P3d 264, *rev den*, 357 Or 595 (2015) (explaining, in the context of the analogous land-use mandamus statute that applies to cities, that "fee entitlement is permissive, predicated on the trial court's exercise of discretion"). We therefore review the award for an abuse of discretion. *See* ORS 20.075(3) ("In any appeal from the award or denial of an attorney fee subject to this section, the court reviewing the award may not modify the decision of the court in making or denying an award, or the decision of the court as to the amount of the award, except upon a finding of an abuse of discretion."). A circuit court can abuse its discretion if it bases its decision on an erroneous understanding of the scope or content of the factors set forth in ORS 20.075(1). *See Niman and Niman*, 206 Or App 400, 415, 421, 136 P3d 1186 (2006) (explaining that an abuse of discretion can arise from a court's erroneous

understanding of the scope and content of discretionary factors).

In this case, the circuit court based its decision in considerable part on the fact that O'Connor elected to pursue mandamus relief even though the city appeared to be willing and ready to make a decision on the permit. In initially granting summary judgment, the court had explained its view that the right to mandamus relief is limited to cases in which no other "plain, speedy, and adequate remedy" exists. *See* ORS 34.110 ("The writ [of mandamus] shall not be issued in any case where there is a plain, speedy and adequate remedy in the ordinary course of the law."). The court ruled:

> "Further, the Court finds that there was a plain, speedy, and adequate remedy for [O'Connor] in the ordinary course of the law and mandamus would be inappropriate in this case. [O'Connor] filed this matter on the date set for a final decision to be issued by the County. Twelve hours later, appeal (if necessary) would have been exclusively to LUBA, a body created to address such controversies.
>
> "While this Court understands that under certain circumstances mandamus is authorized by statute and appropriate, under these undisputed facts—where the County was very likely within 12 hours of issuing its final decision—it was not and mandamus will be DENIED."

The court's ruling on attorney fees drew, in part, on that same reasoning. The court explained:

> "First, [O'Connor] believed (at the time) the County *could* still issue a valid decision in his favor at the July 29, 2010 hearing. Second, if [O'Connor] was unprepared for the July 29, 2010 final hearing he would likely have been unprepared for an earlier hearing. And third, after [O'Connor] filed the request for continuance (in which he asserted that the process was 'timely'), [O'Connor] decided that if his continuance request was not granted he would seek mandamus rather than proceed before the County. In summary, evidence in the record indicates to this Court that this mandamus action was filed not because the County had failed to take timely final action, but because [O'Connor] believed his chances of success (and the time allowed to prepare) would be greater in Circuit Court than before the County

on July 29, 2010 (where he likely assumed he would lose) and LUBA thereafter. [O'Connor] took a calculated risk and lost. But the decision to initiate this litigation rather than proceed before LUBA was entirely with [O'Connor]. Consideration of these facts weighs toward a finding that the imposition of reasonable attorney's fees is proper.

"Also, under ORS 20.075(1)(c) - (d) this Court believes that an award of attorney's fees in this matter would not dissuade legitimate claims but only encourage attorneys to consider whether mandamus is appropriate in their case before pursuing it.

"In conclusion, the law provides for attorney's fees. The questions before the Court were worthy of dispute. The suit was well litigated. However, *I do not believe this case was necessarily appropriate for mandamus, which I believe was used as an alternative to LUBA on the eve of a final decision by the County.* Here, the factors influence this Court to decide that attorney's fees are appropriate."

(First emphasis in original; second emphasis added.)

On appeal, O'Connor argues that the circuit court erred in relying on the alternative of LUBA, because an award of attorney fees based on that factor would "clearly deter other land use applicants from pursuing their rights to a writ of mandamus, while defeating the purpose of ORS 215.427 to make Counties provide timely decisions on land use matters." O'Connor points out that the court had "previously ruled that there was a genuine issue of fact as to whether or not [his] application was complete on December 2, 2010," and that "[t]he record in this matter is fairly clear that the County is a forever moving target with belated request for documentation, refusing to sign off on [O'Connor's] LOMA application after requesting it, and then blaming [O'Connor] for failing to meet procedural requirements for the application."

We agree with O'Connor that the circuit court erred in relying on the fact that he proceeded with a mandamus petition for strategic reasons despite the county's willingness to issue a decision promptly. As the Supreme Court has observed, the land-use mandamus statutes grant an applicant a "statutory right, not merely to an order that rules on the application, but to an order *compelling an approval*. If

a [local government] could avoid the mandamus remedy by denying the application on the eve of a court hearing, the incentive to make a timely decision within 120 days would disappear." *State ex rel Compass Corp. v. City of Lake Oswego*, 319 Or 537, 545, 878 P2d 403 (1994) (emphasis in original). Thus, "[p]roperly viewed, the approval action that the court compels through mandamus is not a second decision by the [local government]; it is an action that the law requires as a consequence of the [local government's] violation of the 120-day deadline. \* \* \* The applicant's right to that remedy is not affected by the [local government's] decision, after the 120-day period has expired, to deny the application." *Id.* at 545-46.

Furthermore, ORS 215.429(4) explicitly authorizes applicants to elect whether to pursue mandamus relief or to continue with the administrative process:

> "If the governing body does not take final action on an application within 120 days or 150 days, as appropriate, of the date the application is deemed complete, *the applicant may elect to proceed with the application according to the applicable provisions of the county comprehensive plan and land use regulations or to file a petition for a writ of mandamus under this section.* If the applicant elects to proceed according to the local plan and regulations, the applicant may not file a petition for a writ of mandamus within 14 days after the governing body makes a preliminary decision, provided a final written decision is issued within 14 days of the preliminary decision."

(Emphasis added.) That choice is inherently strategic, in light of the differences between the two forums themselves (court and agency) and the nature of the decisions in each forum. *See State ex rel K. B. Recycling v. Clackamas Cty.*, 171 Or App 46, 50, 14 P3d 643 (2000) ("One might, of course, take precisely the opposite view from the county's [contention that the applicant engaged in improper 'forum shopping'], *i.e.*, that the purpose of the mandamus statutes is to provide an alternative forum to applicants when the first forum at which they shopped has failed to deliver the goods in the time and manner required by state law. Indeed, we indicated as much in *State ex rel Coastal Management v. Washington County*, 159 Or App 533, 551-52, 979 P2d 300

(1999), in rejecting a point similar to the one that the county makes here. *See also State ex rel Aspen Group v. Washington County,* 166 Or App 217, 996 P2d 1032 (2000)." (Emphasis omitted.)).

To impose attorney fees on an applicant for making the strategic election that is authorized by ORS 215.429 would, in our view, frustrate the purpose of the land-use mandamus statute. If applicants with meritorious claims under that statute expose themselves to the risk of attorney fees merely by electing mandamus for strategic reasons—for instance, because they think they have a better chance of prevailing in court or would feel better prepared to litigate in that forum—it would chill the use of the mandamus remedy in a way that is contrary to the legislature's manifest intent.

Accordingly, we conclude that the circuit court erred in partly basing its award of attorney fees on the fact that O'Connor made a strategic decision to pursue mandamus rather than continue with the administrative process. Because we cannot tell what award, if any, the court would have made without that consideration, we vacate and remand for reconsideration.[10] *See Stewart,* 268 Or App at 503 (explaining that "'vacated and remanded for reconsideration' is the strongly presumptive disposition when a trial court has misconstrued or misapplied one or more considerations bearing on the exercise of discretion"); *Shumake v. Foshee,* 197 Or App 255, 261, 105 P3d 919 (2005) ("If * * * we determine that the court erred in arriving at one or more of its subsidiary legal conclusions or factual findings, we ordinarily will say so and then remand for reconsideration.").

In Case No. A149697, appeal dismissed as moot. In Case No. A152148, general judgment affirmed; supplemental judgment for attorney fees vacated and remanded.

---

[10] Although the court's opinion regarding attorney fees indicates that there was uncertainty about when the application was "complete" for purposes of triggering the mandamus statute, we do not understand the circuit court to have ruled that O'Connor lacked a good-faith belief or was objectively unreasonable in believing that he was authorized to pursue mandamus relief under ORS 215.429 on the record in this case.